Scott Griffiths (028906)
**LAW OFFICE OF SCOTT GRIFFITHS PLLC**
201 E Southern Avenue, Suite 207
Tempe, Arizona 85282
Ph: 602-875-0601
Fax: 602-926-1864
docket@griffithslawaz.com
*Attorney for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Marnie Bryan,<br><br>  Plaintiff,<br> v.<br><br>Maricopa County, a jural entity; Paul Penzone in his official capacity as Maricopa County Sheriff; Gary and Jane Doe Kaplan, a married couple; Does 1-100,<br><br>  Defendants. | Case No.: 2:21-cv-01410-SRB<br><br>**FIRST AMENDED COMPLAINT** |

For her First Amended Complaint against Defendants, Plaintiff Marnie Bryan alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Marnie Bryan is a resident of Maricopa County, Arizona.

2. Defendant Maricopa County is a political subdivision of the State of Arizona that can sue and be sued in its own name.

3. Defendant Paul Penzone is the Sheriff of Maricopa County and is sued in his official capacity. He is the final decision-maker for Maricopa County in the area of law enforcement and is responsible for setting and implementing the policies and practices of the MCSO, including but not limited to, creating and regulating policies regarding the professional behaviors and acts of MCSO employees, including Detective Gary Kaplan.

4. Defendant Gary Kaplan was, at the time of the events alleged herein, a resident of Maricopa County, Arizona.

5. Defendant Jane Doe Kaplan is the spouse of Gary Kaplan. Defendant Jane Doe Kaplan is named because at all relevant times herein, Defendant Gary Kaplan was acting for the benefit of his marital community and therefore the marital community is liable for the acts of Defendant Gary Kaplan.

6. Defendants Does 1-100 represent individual and entity defendants whose identities are currently unknown but are responsible, in whole or in part, for Plaintiff's damages alleged herein. Plaintiff will move to substitute the names of these defendants upon discovery of same.

7. For the purposes of Plaintiff's claims arising under 42 U.S.C. §1983, at all relevant times, Defendants were acting under the color of state law.

8. For the purposes of Plaintiff's state law claims, Defendant Paul Penzone is liable for the acts and omissions of Defendant Gary Kaplan under the theory of *respondeat superior*.

9. Venue is proper in this Court as the actions and events at issue in this case occurred in Maricopa County, Arizona.

10. This court has subject matter jurisdiction of the matters at issue in this Complaint.

11. Plaintiff has served a Notice of Claim on Maricopa County, the MCSO, and Gary Kaplan in compliance with A.R.S. § 12-821.01. More than sixty days has passed since the Plaintiff has served the Notice of Claim and Defendants have not responded to said Notice of Claim.

//
//

## FACTUAL ALLEGATIONS

12. On or about the evening of July 17, 2020, Plaintiff went to her boyfriend, William's, home in Chandler. Before she arrived and continuing after she got there, William had consumed alcohol and drugs.

13. A short while later, William began arguing with Plaintiff and became verbally and physically abusive to Plaintiff.

14. William physically assaulted Plaintiff and threatened her life with a pistol that he had in his home. He had used that same pistol to threaten Plaintiff in a similar manner on prior occasions.

15. Being timid and passive, Plaintiff slowly de-escalated the situation before calling a Lyft and fleeing the scene to her own apartment.

16. Back in the safety of her apartment, Plaintiff was distraught, emotional, and physically drained. She ended up falling asleep for a few hours.

17. When she woke up the following morning, she contacted the Mesa Police Department, and an officer was immediately dispatched to meet her. After learning that the domestic assault had happened on a county island in Chandler, the Mesa Police Department directed her to contact the MCSO to report the crime.

18. When Plaintiff contacted MCSO, an officer immediately responded to her home location. That officer took notes and started a report. Plaintiff was asked to go to the MCSO's Mesa office on Monday morning, July 20th to meet with Detective Gary Kaplan.

19. On Monday morning, Plaintiff went to the MCSO's office to meet Detective Gary Kaplan.

20. When Plaintiff arrived at Detective Kaplan's office, she was quickly ushered back to an interview room where they discussed the events of the prior evening and William's threats to kill her.

21. Detective Gary Kaplan learned about William and his violent outbursts.

22. Detective Kaplan also learned that Plaintiff was previously emotionally and physically abused and that she immediately and easily acquiesces to authority.

23. When the interview was over, Plaintiff returned to the lobby to wait for her sister to come pick her up. Detective Kaplan followed her to the lobby and told her that he didn't want her to wait alone and sat with her in the lobby, continuing small talk and learning about her.

24. After Plaintiff's sister arrived at the MCSO office, Plaintiff left with her sister.

25. Plaintiff had not even gotten a mile away before she began receiving text messages from Detective Kaplan urging her to get a restraining order against William.

26. Detective Kaplan offered to pick Plaintiff up the following morning from her house to take her to get the restraining order.

27. Plaintiff acknowledged the texts but did not think it was appropriate for Detective Kaplan to assist her in doing so.

28. The following morning, Plaintiff called a Lyft and went to the courthouse to get the restraining order against William.

29. While she was there, Detective Kaplan began texting Plaintiff, offering to pick her up at her house and accompany her to get the restraining order.

30. When Plaintiff responded that she was already at the courthouse, Detective Kaplan insisted that he would come pick her up and take her home from the courthouse.

31. Plaintiff was unsure of what to do and how to respond. She did not feel comfortable, but she knew that Detective Kaplan was actively investigating the case against William and trusted that he was looking out for her interests.

32. Plaintiff acquiesced and agreed to let Detective Kaplan drive her home.

33. Detective Kaplan arrived at the courthouse in his MCSO vehicle and was dressed in his work uniform.

34. On the way to her home, Detective Kaplan pushed to learn more about Plaintiff's home life. For instance, Detective Kaplan asked her who she lived with. Plaintiff answered that she lived with her son.

35. Detective Kaplan then asked if Plaintiff's son was at home right then. Plaintiff began responded that her son was at home.

36. Detective Kaplan continued small talk, learning about Plaintiff's home life and interests.

37. After a few moments, they arrived at Plaintiff's home. Detective Kaplan watched as Plaintiff got out of Kaplan's vehicle, unlocked the door, and went into her home.

38. Moments after dropping her off, Kaplan continued to send text messages to Plaintiff.

39. He texted a "*word of advice… don't date crazy men*." He included an emoji with the text message.

40. Plaintiff thought that the text messages were inappropriate and felt that the inclusion of the emoji was unprofessional and too friendly. But she trusted that Detective Kaplan was working in her best interest and was helping her deal with William and the fact that he had threatened her life with a gun. Plaintiff responded in joking fashion.

41. Detective Kaplan pushed for more, texting her that she needed a dog.

42. Plaintiff responded that she had a German Shepherd and they exchanged messages about German Shepherd dogs.

43. Detective Kaplan texted, "*I wld have love to have met him*" and eventually texted, "*I'm still only 2 miles away. Shod I turn around and say hi*".

44. Plaintiff was unsure of what to do and became nervous and flustered. Not wanting to upset Kaplan and now knowing how to tell him no, Plaintiff did what she always does – acquiesce to authority. She answered, "*sure*". Detective Kaplan responded, "*5 min*."

45. When Detective Kaplan arrived back at Plaintiff's home, he invited himself into her home.

46. While he was there, Detective Kaplan met Plaintiff's dog and began playing with the dog.

47. Detective Kaplan initially sat in a chair across the room from Plaintiff.

48. He soon moved closer to her from his seat to the couch where she was sitting. As they both sat on the opposite ends of the couch, Detective Kaplan began moving toward her until he was next to her.

49. Plaintiff began to get scared and excused herself to the restroom.

50. When she came out of the restroom, Detective Kaplan was standing at the door of the restroom. Detective Kaplan asked where her bedroom was, and Plaintiff reluctantly told him that it was the room adjacent to the bathroom.

51. He then walked into her bedroom.

52. Plaintiff was curious why he was walking into her room, so she followed him. When she got to the door, she peered into the room and saw that Detective Kaplan was taking off his gun belt and then started taking off his clothes.

53. As he finished undressing, he ordered Plaintiff to do the same.

54. Plaintiff knew that Detective Kaplan was investigating William and didn't want to anger Detective Kaplan to the point that he would stop the investigation. She had also never been in a position where a man, let alone a law enforcement officer, was in her home and demanding that she undress.

55. Plaintiff, who has a history of traumatic experiences with men, did not know what to do or how to respond. So, she once again acquiesced and complied with his order.

56. Detective Kaplan then proceeded to push Plaintiff down onto her bed and force himself on her sexually, raping her without a condom.

57. When Detective Kaplan was done, he quickly got dressed and started toward the door.

58. As Detective Kaplan left Plaintiff's home, he told her that she was lucky and that she could check one item off her bucket list. When Plaintiff asked what he meant, Detective Kaplan responded that sleeping with a cop was something that all women wanted and that she was lucky that he had.

59. After he left her house, Plaintiff was emotional and had no idea how to even process what had happened.

60. Within hours of leaving her home, Detective Kaplan began texting Plaintiff again, asking personal things like what she was wearing, if he could come back to her house, if she had a good time with him, if her "dog" needed another visit.

61. Plaintiff was terrified after what happened and was afraid that if she responded to personal questions, he would take it as an invitation to come back and rape her again. She also felt that if she didn't respond, Detective Kaplan would not continue his investigation.

62. So, fearing reprisal from Detective Kaplan, she began responding to his text messages more and more slowly and tried to politely reject his messages. Soon afterward, Detective Kaplan slowed down his texting.

63. Sometime in the first week of August, William broke into Plaintiff's house and found her phone. He looked through her phone without permission.

64. When William opened her phone and discovered the text messages, he figured out that Detective Kaplan had abused his position of authority to become friendly and flirtatious with Plaintiff.

65. William told Plaintiff that the charges against him needed to be dropped or he planned on calling the MCSO to report Detective Kaplan's personal relationship and the obvious conflict of interest in Kaplan's relationship with Plaintiff.

66. Plaintiff, now scared with the prospect that William may not be charged with assaulting her and threatening her life, called Detective Kaplan to tell him about William and his threat.

67. In response, Detective Kaplan immediately drove to Plaintiff's home in full uniform and in the black SUV that MCSO detectives drive.

68. When he arrived, Detective Kaplan looked at the phone and William's text messages briefly. He appeared to type a message and delete some other messages before closing her phone.

69. Detective Kaplan then turned to Plaintiff and moved closer to her, backing her into the bedroom, where he raped her again, without a condom. This time, Plaintiff was still wearing her dress.

70. When Detective Kaplan finished, he immediately got dressed and left Plaintiff's home.

71. Within a day or two, the Maricopa County Attorney's Office decided that it would not press charges against William. As a result, William's charges were dropped.

7

72. In the days following the second assault, Plaintiff initially hid the fact that she was raped and taken advantage of by Detective Kaplan. But soon the emotional turmoil was too much for her and she reluctantly told her family about Detective Kaplan and how he had raped her twice.

73. Plaintiff's family urged her to go to the hospital or, at a minimum, contact the MCSO to report the rape. But Plaintiff was deathly afraid of Detective Kaplan and decided, like many rape victims do, to not report it.

74. Meanwhile, William was unafraid of Detective Kaplan. On or about September 17, 2020, to get even with Detective Kaplan for not dropping the charges, William contacted the MCSO and told them about Kaplan's relationship with Plaintiff.

75. After receiving William's call, the Sheriff's Office opened a case with the Professional Standards Bureau (the "PSB"), the department at the MCSO that investigates officer conduct.

76. On or about September 23, 2020, the MCSO, through Detective Kaplan, closed its investigation into William.

77. However, an investigation into Detective Kaplan was already underway and on October 2, 2020, investigators from the PSB interviewed Plaintiff and learned her side of the story.

78. Incredibly, the detectives with the PSB told Plaintiff that Detective Kaplan had sexually assaulted victims of other violent crimes and assured her that Plaintiff was not alone.

79. In other words, Defendant Maricopa County knew about Detective Kaplan's proclivity to befriend and sexually assault victims of crimes, including violent crimes.

80. Despite this knowledge, the Defendant Maricopa County permitted Detective Kaplan to continue to work for MCSO, investigate violent crimes, and put victims like Plaintiff, in harm's way.

81. Defendants Maricopa County failed to train its detectives, including Detective Kaplan, about Plaintiff's well-established right to bodily integrity and security.

82. Likewise, Defendants Does 1-100 also knew about Detective Kaplan's proclivity to befriend and sexually assault victims of crimes, including violent crimes. Does 1-100 failed to

intervene to prevent Detective Kaplan from being in a position to sexually assault victims of crimes.

83. The detectives at the PSB asked for Plaintiff's help in getting Detective Kaplan to admit his acts.

84. At first, Plaintiff refused to assist the PSB. But after learning that Kaplan had done this before, she reluctantly agreed to assist the PSB by texting and then making a telephone call to Detective Kaplan on his department issued cell phone.

85. Working with PSB, Plaintiff told Detective Kaplan that she was pregnant from the rape.

86. During the recorded conversation, Detective Kaplan admitted that he had in fact had sex with her and offered to pay for an abortion.

87. A short while later, the investigators from the PSB went to Detective Kaplan's office and conducted an interview with him wherein he freely admitted the sexual encounters with Plaintiff.

88. In the hours after Plaintiff bravely called Detective Kaplan and got him to admit his acts, Detective Kaplan was arrested and charged with two counts of violating A.R.S. § 13-1412 – Unlawful Sexual Conduct; Peace Officer.

89. However, the charges were dropped almost immediately after the Maricopa County Attorney's Office decided that Plaintiff, the victim of William's domestic violence, was not a "*subject of an investigation.*"

90. Detective Kaplan was released from custody and now Plaintiff lives in fear of reprisal from Detective Kaplan and his law-enforcement friends at the MCSO.

91. Upon information and belief, Detective Kaplan still works for MCSO and is still a detective where he has the capacity to manipulate and take advantage of victims of crimes, like Plaintiff.

92. Plaintiff has since searched online and found at least one other instance where a different MCSO detective had slept with witness(es) to crimes and had not been fired or otherwise punished. Even after the well-publicized events surrounding that officer, Defendant Maricopa

County failed to enact policies or procedures to prevent such actions on the part of its employees, including Defendant Kaplan.

93. As a result of the Defendants' actions and inactions, Plaintiff has incurred mental anguish and psychological/emotional damages in an amount to be proven at trial.

94. Upon information and belief, Defendant Kaplan remains employed by the Maricopa County Sheriff's Office as a detective.

## CLAIMS FOR RELIEF

### COUNT 1
### Violation of Fourteenth Amendment / 42 U.S.C. § 1983
### (Against Defendant Gary Kaplan and Doe Defendants)

95. Plaintiff restates and realleges the allegations of the previous paragraphs in this Complaint as if fully set forth herein.

96. At all relevant times, Defendants Gary Kaplan and Doe Defendants were acting under the color of state law.

97. As alleged herein, Defendant Kaplan knew he should not have sexually assaulted Plaintiff or had sex with the victim of a crime that he was investigating.

98. As alleged herein, Doe Defendants knew that Defendant Kaplan had a proclivity toward aggressively seeking sexual relationships with victims of crimes he was investigating.

99. Plaintiff had a protected liberty interest in freedom from sexual advances, abuse, and harassment created by Defendant Kaplan and Doe Defendants.

100. Plaintiff's rights to bodily security include the right to be free from sexual abuse at the hands of law enforcement officers who are investigating crimes where Plaintiff was a victim.

101. As alleged herein, Defendant Kaplan sexually assaulted Plaintiff on multiple occasions while she was in a weakened and victimized state.

102. In doing so, or in preparation for doing so, he presented himself in full uniform and using County issued vehicles and phones. He utilized his position of power and authority as a law enforcement officer and investigator of violent crimes to befriend Plaintiff.

103. Detective Kaplan offered to assist Plaintiff in securing a ride to and from the courthouse to get an order of protection. He offered advice about getting a dog. He made personal comments to Plaintiff about her choice in men while he was in a position of power and authority and while Plaintiff was in a weakened and victimized state. In doing so, Detective Kaplan preyed on Plaintiff using the trappings of his uniform and as a detective for MCSO.

104. As a result of Defendant Kaplan and the Doe Defendants' actions and inactions, Plaintiff sustained damages, including mental anguish and psychological/emotional damages in an amount to be proven at trial.

105. Pursuant to 42 U.S.C. § 1983, Plaintiff is entitled to an award of compensatory and punitive damages due to Defendant Kaplan and the Doe Defendants' reckless and callously indifferent conduct.

106. Pursuant to 42 U.S.C. § 1988 and other applicable law, Plaintiff is entitled to an award of her incurred attorneys' fees and costs.

## COUNT 2
### Intentional Infliction of Emotional Distress
### (Against Defendants Kaplan & Penzone)

107. Plaintiff restates and realleges the allegations of the previous paragraphs in this Complaint as if fully set forth herein.

108. As alleged herein, Detective Kaplan sexually assaulted Plaintiff twice. As such, Detective Kaplan's actions were intentional and reckless.

109. Likewise, Detective Kaplan's conduct was extreme and outrageous. This is because he sexually assaulted Plaintiff while investigating a violent crime where Plaintiff was a victim. Detective Kaplan used the trappings of this position of authority and responsibility to gain Plaintiff's trust and gain access to her home.

110. As a result of Defendant Kaplan's actions, Plaintiff sustained damages, including mental anguish and psychological/emotional damages in an amount to be proven at trial.

111. Sheriff Paul Penzone is liable for the actions of his employees and agents, including Detective Kaplan, under the theory of *respondeat superior*.

# COUNT 3
## Negligent Training, Supervision, and Retention
### (Against Defendants Maricopa County and Penzone)

112. Plaintiff restates and realleges the allegations of the previous paragraphs in this Complaint as if fully set forth herein.

113. As the governmental agency responsible for the actions of the MCSO and its officers, Defendant Maricopa County owed a duty to the public to properly train and supervise its employees, including Detective Kaplan. This includes, without limitation, training its detectives to respect professional and personal boundaries. This also includes supervising detectives that it suspects, or knows, have a proclivity to have sexual relationships with witnesses or victims of crimes.

114. As the elected official responsible for the actions of the MCSO and its officers, Defendant Paul Penzone owed a duty to the public to properly train and supervise its employees, including Detective Kaplan. This includes, without limitation, training its detectives to respect professional and personal boundaries. This also includes supervising detectives that it suspects, or knows, have a proclivity to have sexual relationships with witnesses or victims of crimes.

115. As alleged herein, Defendants Maricopa County and Paul Penzone knew or should have known about prior instances where Detective Kaplan had inappropriate sexual relationships or sexually assaulted a witness or victim of a crime that he was investigating.

116. Despite this knowledge, Defendants Maricopa County and Paul Penzone retained Detective Kaplan.

117. Defendants Maricopa County and Paul Penzone failed to properly train its detectives, including Detective Kaplan, to avoid violating professional and personal boundaries resulting in sexual relationships or assaults with witnesses or victims, including Plaintiff.

118. As alleged herein, Defendants Maricopa County and Paul Penzone failed to properly supervise its detectives, including Detective Kaplan, resulting in another instance where Detective Kaplan exploited his position of power to sexually assault Plaintiff.

119. As a result of Defendants Maricopa County and Paul Penzone's breaches of their duties, Plaintiff sustained damages, including mental anguish and psychological/emotional damages in an amount to be proven at trial.

## COUNT 4
### Battery
### (Against Defendants Gary Kaplan and Penzone)

120. Plaintiff restates and realleges the allegations of the previous paragraphs in this Complaint as if fully set forth herein.

121. As alleged herein, Defendant Kaplan intentionally caused offensive and harmful contact with Plaintiff.

122. As a result of Defendant Kaplan's actions, Plaintiff sustained damages, including mental anguish and psychological/emotional damages in an amount to be proven at trial.

123. Sheriff Paul Penzone is liable for the actions of his employees and agents, including Detective Kaplan, under the theory of *respondeat superior*.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks a judgment in its favor and against all Defendants:

A. For compensatory, general, and special damages in an amount to be proven at trial, including compensation for loss of enjoyment of life, that is, the participation in life's activities to the quality and extent normally enjoyed before the events alleged in this Complaint;

B. For punitive damages;

C. For attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law;

D. For pre-judgment and post-judgment inter to the extent permitted by law;

E. For such other and further relief as the Court deems just and proper under the circumstances.

**RESPECTFULLY SUBMITTED** this 11th day of January 2022.

                                    **LAW OFFICE OF SCOTT GRIFFITHS PLLC**

                                    */s Scott Griffiths*
                                    Scott Griffiths
                                    201 E Southern Ave, Suite 207
                                    Tempe, Arizona 85282
                                    *Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 11, 2022, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Sarah L. Barnes
Nicole M. Prefontaine
**BROENING OBERG WOODS & WILSON, PC**
2800 North Central Avenue, Suite 1600
Phoenix, AZ 85004
slb@bowwlaw.com
nmp@bowwlaw.com
*Attorney for Defendant Kaplan*


Pamela A. Hostallero
Jonathan C. Simon
Maricopa County Attorney's Office
Civil Services Division
225 W. Madison
Phoenix, AZ 85003
hostallp@mcao.maricopa.gov
*Attorney for Defendants Penzone and Maricopa County*


By: <u>/s Scott Griffiths</u>